KAB

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jeremy Pinson, | No.  CV 19-00235-TUC-RM |
| Plaintiff, | |
| v. | **ORDER** |
| United States Department of Justice, et al., | |
| Defendants. | |

Plaintiff Jeremy Pinson, who is currently confined in the United States Penitentiary ("USP")-Coleman, brought this civil rights action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), 28 U.S.C. § 1331, the Federal Tort Claims Act ("FTCA"), and 5 U.S.C. § 702.  (Doc. 8.)  Defendants move for summary judgment, and Plaintiff opposes.[1]  (Docs. 102, 114.)

I.     **Background**

In her First Amended Complaint, Plaintiff relevantly alleged as follows.  Plaintiff was diagnosed with gender dysphoria in 2015 and was prescribed hormone therapy and gender-affirming surgery, but in 2019, Defendant Brieschke advised Defendant Dr. Haight-Biehler that Plaintiff's treatments were prohibited; Plaintiff's treatments were categorically denied, and Plaintiff's hormones were subject to repeated interruptions.

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response.  (Doc. 108.)

(Doc. 10 at 4.)   While at USP-Tucson, Plaintiff consistently sought gender-affirming surgery, electrolysis, and hormone therapy.  (Doc. 8 at 2.)  In her request for relief, Plaintiff relevantly sought monetary damages and an order compelling the Federal Bureau of Prisons ("BOP") to provide gender-affirming surgery, hormone therapy and other gender dysphoria accommodations, such as makeup, housing in female prison, electrolysis, and beard trimmers.  (Doc. 8 at 6.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated claims for injunctive relief against the United States and the BOP and an Eighth Amendment medical care claim against Defendants Haight-Biehler and Brieschke.  (Doc. 10.)  The Court also found that Plaintiff alleged the existence of a policy that facially discriminates on the basis of sex because Plaintiff alleged that she is denied care with no individualized determination as to medical necessity solely because the care would constitute gender-affirming surgery.  (*Id.*)  The Court dismissed the remaining claim.  (*Id.*)

In an August 13, 2020 Order, the Court partially granted summary judgment in favor of Defendants as to Plaintiff's claims relating to seeing an endocrinologist, electrolysis, feminine hygiene items, and transfer to a female facility based on Plaintiff's failure to properly exhaust her administrative remedies as to those claims.  (Doc. 43.)  The Court noted that the remaining claims in this action are Plaintiff's Eighth Amendment and injunctive relief claims relating to: (a) Plaintiff's allegations that she was improperly denied gender-affirming surgery, including the existence of a policy that facially discriminates on the basis of sex because Plaintiff alleged that she is denied care with no individualized determination as to medical necessity solely because the care would constitute gender-affirming surgery, and (b) Plaintiff's allegations regarding changing her Estradiol therapy from pills to a patch.  (*Id.*)

Defendants now move for summary judgment on those remaining claims.

## II.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

- 2 -

1    Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

2    movant bears the initial responsibility of presenting the basis for its motion and identifying

3    those portions of the record, together with affidavits, if any, that it believes demonstrate

4    the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

5         If the movant fails to carry its initial burden of production, the nonmovant need not

6    produce anything.  *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03

7    (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the

8    nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact

9    in contention is material, i.e., a fact that might affect the outcome of the suit under the

10   governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a

11   reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*,

12   477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216,

13   1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact

14   conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-

15   89 (1968); however, it must "come forward with specific facts showing that there is a

16   genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

17   587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

18        At summary judgment, the judge's function is not to weigh the evidence and

19   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

20   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

21   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

22   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

23   . . . .

24   . . . .

25   . . . .

26   . . . .

27   . . . .

28   . . . .

**III.    Facts**[2]

Plaintiff Jeremy Pinson is in the custody of the BOP and is projected to be released from custody on August 12, 2026.  (Doc. 103 ¶¶ 1-2.)  Plaintiff was incarcerated at USP-Tucson from February 15, 2018 through December 4, 2020, and currently is incarcerated at USP-II Coleman.  (*Id.* ¶ 3.)  Plaintiff is a high security prisoner with maximum custody needs.  (*Id.* ¶ 4.)[3]  As the Warden noted on September 16, 2019,

> Her overall institutional adjustment is rated as poor.  Pinson is a "High" security "MAX" custody inmate whose custody classification score is 27.  Her custody classification form, dated June 28, 2019, scores her with serious violence under five years ago.  She also has a serious disciplinary history of violence toward staff and inmates.  Inmate Pinson has been assigned the following STG's [Security Threat Groups]: Advanced Computer Skills, Assault-Correctional, Explosives Expert, History of Compromising Staff, History of Defeating Restraints, History of Introduction, History of Arson, History of Fraud, History of Mail Abuse, History of Threats Toward Staff, Posted Picture Card File, Secret Service List, and Threats to the Judiciary.

(*Id.* ¶ 5.)

On December 16, 2015, Plaintiff was prescribed Estradiol for the first time.  (*Id.* ¶ 6.)  The Estradiol prescription was in patch form.  (*Id.*)  Plaintiff's Estradiol patch prescriptions were renewed/continued through a prescription on March 23, 2016.  (*Id.*)  On April 8, 2016, Plaintiff complained about the adhesion of the Estradiol patch because, after two days of showering, the patch would peel off.  (*Id.* ¶ 7.)  At that time, Plaintiff requested

---

[2] Plaintiff disputes several facts, but in several instances, it is unclear what the nature of her dispute is or what evidence she relies on for the dispute.  In some of her disputes, Plaintiff mischaracterizes evidence, makes disputes based on irrelevant information, or attempts to testify to facts for which she has not established a competency to testify. Accordingly, the Court does not note Plaintiff's disputes where she has not supported the dispute with competent, relevant evidence.

[3] Plaintiff asserts that she no longer "has maximum custody needs." (Doc. 115 ¶ 4.) Plaintiff asserts that she "did what [she] had to do to stay in maximum custody" so that she would be isolated from male members of the population to protect herself.  (Doc. 115-1 ¶¶ 2-3.)

to switch from the Estradiol patch to the Estradiol pill, and the prescription was changed accordingly. (*Id.* ¶ 7.) Between April 2016 and February 15, 2018, Plaintiff continued to be prescribed Estradiol pills as part of her hormone therapy. (*Id.* ¶ 8.)

Plaintiff was transferred to USP-Tucson on February 15, 2018 and arrived with a current prescription for Estradiol tablets dating back to April 2016. (*Id.* ¶ 8.) The prescription was continued until December 17, 2018, when Plaintiff requested that her estrogen be changed from a pill to a patch, at which time Plaintiff's Estradiol prescription was changed to a .025mg Estradiol patch. (*Id.* ¶ 9.) Plaintiff asserts that she repeatedly requested that Dr. Ash and Dr. Biehler change her estrogen to patch or injection form between February 14, 2018 until it was changed in December 2018. (Doc. 115-1 ¶ 5.)

Plaintiff's medical records do not show any prior requests to change her estrogen from a pill to a patch. (Doc. 103 ¶ 10.) Plaintiff's medical records show that on July 24, 2018, Plaintiff discussed an interest in stopping her estrogen therapy as she believed that she already had achieved all of the body changes she would from the therapy. (*Id.* ¶ 11.) Plaintiff asserts that she sought a change in her estrogen therapy because she was frustrated the therapy was not working, and was told that she needed to be prescribed Lupron. (Doc. 115 ¶ 10; Doc. 115-1 ¶ 9.) Plaintiff submitted a single BP-8 regarding changing her estrogen from a pill to a patch on December 10, 2018, and later submitted a BP-9 on the issue, but the change had already been made. (Doc. 103 ¶ 12.)

Defendant Dr. Haight-Biehler wrote recurring orders for blood work, including testing for levels of Testosterone and Estradiol. (*Id.* ¶ 13.) Plaintiff's hormone therapy was adjusted in attempts to get her testosterone level to a target range. (*Id.* ¶ 14.) The target testosterone for gender-affirming surgery is under 55 ng/dl, and when Plaintiff was at USP-Tucson, Plaintiff's testosterone levels were 368, 152, 83, 310, 267, 281, 656 and 373. (*Id.* ¶ 15.) Plaintiff asserts that her levels were not "regularly tested." (Doc. 115-1 ¶ 13.)

A testosterone level above the target level means that the feminizing effect of the estradiol will not be manifested to the desired level. (Doc. 103 ¶ 16.) For feminizing

hormones to achieve this effect, the estradiol has to be able to overcome the more powerful "native" testosterone, which is the reason for the attempted suppression of the testosterone to the target range.  (*Id.*)  Failure to achieve this will result in incomplete and likely undesirable effects, even if surgery was to be performed.  (*Id.*)

Plaintiff has received regular mental health care while in custody, including over 1,000 contacts with psychology staff and 121 suicide risk assessments.  (*Id.* ¶ 17.)  She engages in self-directed harm.  (*Id.*)  In December 2018, Plaintiff submitted requests for vaginoplasty (gender-affirming surgery.)  (*Id.* ¶ 18.)  On December 15, 2018, she was notified that the Warden would send a request to the BOP's Transgender Executive Council ("TEC") for consideration.  (*Id.* ¶ 19.)[4]

On December 19, 2018, the Warden requested that the TEC review Plaintiff's request for gender-affirming surgery.  (*Id.* ¶ 20.)  The Warden explained that Plaintiff had been diagnosed with gender dysphoria in June 2015, validated transgender male to female in October 2015, and provided hormone medications Estradiol and Spironolactone since April 2016.  (*Id.* ¶ 21.)  The Warden noted that whether hormone treatment had been successful was debatable and that Plaintiff had not met the condition of full-time real life experience in the preferred gender due to her continuous incarceration since the diagnosis.  (*Id.* ¶ 23.)

On January 28, 2019, the Warden's office received Plaintiff's December 10, 2018,

---

[4] The TEC offers advice and guidance on measures related to the unique treatment and management needs of transgender prisoners and/or prisoners with gender dysphoria, including housing and health issues. (*Id.* ¶ 53.)  The TEC is a multi-disciplinary committee and consists of staff members from the BOP's Reentry Services Division, Health Services Division, and Correctional Programs Division.  (*Id.* ¶ 54.)  The TEC includes staff with diverse specialty areas.  (*Id.* ¶ 55.)  Current TEC members include the National Policy Coordinator, two psychologists, a psychiatrist, a pharmacist and two Bureau designations experts.  (*Id.*)  Three of the members are Senior Deputy Assistant Directors and two are Branch Chiefs in relevant specialty areas (psychology and psychiatry).  (*Id.*)  Leadership from the BOP's Designation and Sentence Computation Center—a component of the BOP created to centralize prisoner designation (i.e., placement) within Bureau institutions— provides the TEC with expertise on placement options for transgender prisoners.  (*Id.* ¶ 58.)

BP-9 Requests seeking testicle removal surgery and vaginoplasty.  (*Id.* ¶ 24.)  The BP-9s were consolidated, and the Warden responded that Plaintiff had submitted a request for gender reassignment surgery in December 2018 and a request had been sent to the TEC for consideration.  (*Id.* ¶ 25.)

On February 8, 2019, "after discussion with TEC committee medical advisor," Dr. Haight-Biehler increased Plaintiff's Spironolactone dosage, which is used to repress testosterone, from 150 mg per day to 200 mg per day.  (*Id.* ¶ 26.)

On May 1, 2019, Plaintiff's levels were Testosterone 310 and Estradiol 30.  (*Id.* ¶ 27.)  On September 16, 2019, the Warden again requested the TEC to review Plaintiff's request for gender-affirming surgery and also requested consideration for redesignation to a lower security facility.  (*Id.* ¶ 28.)  The Warden explained Plaintiff's hormone treatment through the years and noted that she had been participating in appropriate psychotherapy. (*Id.* ¶ 29.)  The Warden noted that the condition of full-time real life experience in the preferred gender had not been met as Plaintiff had been incarcerated since diagnosis and that she had a projected release date of May 23, 2026.  (*Id.* ¶ 30.)  The Warden requested "transfer consideration to a lesser security institution which can accommodate Medical Care Level 2 and Mental Health Care Level 3 prisoners.  This will allow inmate Pinson forward progression towards the goal of meeting condition of full-time, real life experience in the preferred gender."  (*Id.* ¶ 31.)  The Warden also included the required information about Plaintiff's institutional adjustment, high security, maximum custody, STGs and disciplinary history, including violence toward both staff and prisoners.  (*Id.* ¶ 32.)  The Warden sought "guidance for progression to the next phase, in the event redesignation to a lesser security institution is not approved."  (*Id.* ¶ 33.)  The request was for a lower security male institution, not a female institution.  (*Id.* ¶ 34.)

The TEC views achieving target hormone levels as a first step for transgender women moving to a female facility.  (*Id.* ¶ 38.)  When transgender women maintain their target hormone levels, they become more feminine in appearance, lose muscle mass, experience lower libido and are not able to maintain erections.  (*Id.* ¶ 38.)  All of these

1    feminizing effects are important for their ability to live in a female institution and for the

2    safety of women who would be their peers at the institution.  (*Id.* ¶ 39.)  The BOP considers

3    placement in a female facility to be a necessary and appropriate step toward surgery.  (*Id.*

4    ¶ 40.)

5            The BOP authorizes its medical staff to provide medically necessary care to

6    transgender prisoners: "Hormone or other necessary medical treatment may be provided

7    after an individualized assessment of the requested inmate by institution medical staff."

8    (*Id.* ¶ 41.)  When a prisoner is diagnosed with Gender Identity Disorder ("GID"), "a

9    treatment plan will be developed which promotes the physical and mental stability of the

10   patient."  (*Id.* ¶ 42.)  Whether or not they were provided prior to incarceration, the plan

11   may include "those elements of the real life experience consistent with the prison

12   environment, hormone therapy, and counseling."  (*Id.* ¶ 43.)  "Current, accepted standards

13   of care will be used as a reference for developing the treatment plan.  All appropriate

14   treatment options prescribed for prisoners with GID in currently accepted standards of care

15   will be taken into consideration during evaluation by the appropriate medical and mental

16   health care staff."  (*Id.* ¶ 44.)  According to the BOP's Clinical Guidelines: "[i]n many

17   cases, treatment is designed to reduce characteristics of the natal sex and induce those of

18   the identified gender, allowing individuals to project their GENDER IDENTITY.  The

19   treatment and management of the TG [Transgender] individual requires individualized care

20   guided by treatment goals to allow for successful TRANSITION through education,

21   counseling, real-life experience, medical evaluation, hormone treatment, and in some

22   cases, gender-affirming surgery."  (*Id.* ¶ 45 (emphasis in original).)

23           The BOP provides hormone treatment in appropriate cases: "Hormone

24   supplementation is an important part of transitional treatment for many transgender

25   individuals."  (*Id.* ¶ 46.)  This is based on studies demonstrating "improvement (in the

26   range of 70–80%) in gender dysphoria, mental health, quality of life, and sexual function,

27   for transgender treatment that included hormone therapy."  (*Id.* ¶ 47.)  Hormone treatment

28   goals are "(1) to suppress endogenous hormones and physical characteristics of the natal

sex and (2) to supplement hormones to enhance characteristics of the preferred gender, utilizing the principles of hormone replacement therapy for hypogonadal individuals of the TG individual's identified gender." (*Id.* ¶ 48.)

When determining a prisoner's eligibility for hormone therapy, the BOP looks to the eligibility criteria identified by the World Professional Association on Transgender Health ("WPATH") and the Endocrine Society. (*Id.* ¶ 49.)[5] "Although individuals may live successfully as transgender persons without surgery, gender-affirming surgery may be appropriate for some and is considered on a case-by-case basis." (*Id.* ¶ 50.)

When considering a prisoner for gender-affirming surgery, in addition to the criteria for hormone therapy, the BOP considers whether a prisoner demonstrates "at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, full-time real life experience in their preferred gender, and consolidation of gender identity." (*Id.* ¶ 51.) The prisoner is required to request surgery and "demonstrate via informed consent a practical understanding of gender-affirming surgery including, but

---

[5] The WPATH Standards of Care ("SOC") recognize that the treatment for gender dysphoria is very individualized, with some patients needing hormones or surgery and some needing neither. (*Id.* ¶ 81.) The WPATH SOC provides: Two referrals—from qualified mental health professionals who have independently assessed the patient—are needed for genital surgery (i.e., hysterectomy/salpingo-oophorectomy, orchiectomy, genital reconstructive surgeries). (*Id.* ¶ 82.) If the first referral is from the patient's psychotherapist, the second referral should be from a person who has only had an evaluative role with the patient. (*Id.*) Two separate letters, or one letter signed by both (e.g., if practicing within the same clinic) may be sent. (*Id.*)

Each referral letter is expected to cover (1) the client's general identifying characteristics; (2) results of the client's psychosocial assessment, including any diagnoses; (3) the duration of the mental health professional's relationship with the client, including the type of evaluation and therapy or counseling to date; (4) an explanation that the criteria for surgery have been met, and a brief description of the clinical rationale for supporting the patient's request for surgery; (5) a statement about the fact that informed consent has been obtained from the patient; and (6) a statement that the mental health professional is available for coordination of care and welcomes a phone call to establish this. (*Id.* ¶ 82.)

Plaintiff does not have a letter from a mental health or medical professional approving her for the surgery. (*Id.* ¶ 83.)

1   not limited to, permanence, potential complications, and short and long-term treatment

2   plans." (*Id.* ¶ 52.)

3       In designating prisoners, the BOP's Designation and Sentence Computation Center

4   ("DSCC") considers relevant Bureau policy on prisoner security and custody classification.

5   (*Id.* ¶ 59.)  This policy focuses on three primary factors for making designation decisions:

6   (1) the level of security and supervision the prisoner requires; (2) the level of security and

7   staff supervision the institution is able to provide; and (3) the prisoner's program needs.

8   (*Id.* ¶ 60.)

9       Other factors to be considered include: the prisoner's release residence; the level of

10  overcrowding at an institution; any security, location, or program recommendation made

11  by the sentencing court; any Central Inmate Monitoring issues; any additional security

12  measures to ensure the protection of victims/witnesses and the public in general; and, any

13  other factor(s) which may involve the prisoner's confinement, the protection of society,

14  and/or the safe and orderly management of a Bureau facility.  (*Id.* ¶ 61.)  The TEC is

15  empowered to recommend that the DSCC re-designate a prisoner.  (*Id.* ¶ 62.)

16      The BOP does not ordinarily consider gender-affirming surgery for transgender

17  females until after successful re-designation to a female institution for twelve months.  (*Id.*

18  ¶ 63.)  Because prisons are segregated by sex, it is not possible for transgender individuals

19  to fully experience their gender in reference to same-gender peers without this experience.

20  (*Id.* ¶ 64.)  The BOP has learned through experience that not all transgender women adapt

21  successfully to female prisons.  (*Id.* ¶ 65.)  In some cases, transgender women have behaved

22  in ways that made it unsafe to maintain them in a female prison and they have had to return

23  to a male prison.  (*Id.* ¶ 66.)  In other cases, they have requested to return to a male prison.

24  (*Id.* ¶ 67.)  Therefore, the TEC views the experience of living in a prison consistent with

25  an individual's gender identity as a critical step in the transition process.  (*Id.* ¶ 68.)

26      If a transgender woman is not able to live in a female prison or does not wish to

27  continue in that setting, it is very important to have this information prior to surgical

28  procedures.  (*Id.* ¶ 69.)  The BOP makes individualized decisions about transgender

prisoner housing, considering, among other factors, gender identity, the safety of all parties and individual prisoner behavior and history. (*Id.* ¶ 70.) This is necessary to ensure the needs of transgender prisoners are addressed and safety is maximized for all prisoners. (*Id.* ¶ 71.) Designation to a facility of the prisoner's identified gender would be appropriate after consideration of all of the factors and "where there has been significant progress towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments." (*Id.* ¶ 72.)

The BOP has taken steps to move transgender women to female prisons, when the policy requirements are met. (*Id.* ¶ 73.) Currently, six prisoners who are identified in the BOP's recordkeeping system as transgender are living in institutions consistent with their identified gender. (*Id.* ¶ 74.) A small number of transgender female prisoners previously have been placed in gender-affirming settings, but have been released or returned to male facilities. (*Id.* ¶ 75.)

The BOP first reviews safety and security issues with the TEC before recommendations for gender-affirming surgery may be forwarded to the Medical Director for approval. (*Id.* ¶ 76.) When a prisoner has satisfied the criteria for gender-affirming surgery, requests for surgery are transmitted to the Transgender Clinical Care Team ("TCCT"), which makes a recommendation to the Medical Director, who is the approving authority. (*Id.* ¶ 77.) The referrals to the TCCT "should include comprehensive medical and mental health summaries, a comprehensive psychosocial assessment (preferably by a licensed clinical social worker), and a criminal history and institutional adjustment report." (*Id.* ¶ 78.)

On October 10, 2019, the TEC reviewed Plaintiff's case, and recommended continued placement at USP-Tucson, continual monitoring of hormones and to provide appropriate gender-affirming accommodations. (Doc. 103 ¶ 35.) The TEC did not recommend surgery at that time. (*Id.* ¶ 36.)[6] Plaintiff was not an appropriate candidate for

---

[6] Plaintiff asserts that there is no evidence her surgery was considered. (Doc. 115 ¶ 36.)

transfer to a female institution due to her hormone levels not being within the target range for testosterone.  (*Id.* ¶ 37.)[7]

Neither Dr. Haight-Biehler nor Mr. Brieschke is or has ever been the Medical Director or a member of or advisor to the TEC or the TCCT.  (*Id.* ¶ 79.)  Plaintiff has admitted that the BOP's Medical Director, not Dr. Haight-Biehler or Mr. Brieschke, has the authority to approve her gender-affirming surgery.  (*Id.* ¶ 80.)  At all relevant times, Defendant Brieschke was an attorney with the BOP with no authority to prescribe Estradiol patches or direct anyone to do so.  (*Id.* ¶ 84.)

## IV.  Discussion

Defendants assert that they are entitled to summary judgment because Plaintiff's constitutional rights have not been violated, the individual Defendants are entitled to qualified immunity, and Plaintiff's claim for gender-affirming surgery should be dismissed pursuant to the First-to-File rule.

### A.     First-to-File

Defendants assert that Plaintiff's claim for relief seeking gender-affirming surgery should be dismissed because there is a case pending in the Middle District of Pennsylvania that Plaintiff filed prior to this action, and Plaintiff seeks gender-affirming surgery as relief in that action.

Plaintiff filed her Complaint in the Middle District of Pennsylvania on April 3, 2017. (*Pinson v. United States*, No. 1:17-cv-00584-SHR-SM (M.D. Penn.), Doc. 1.)  In that action, Plaintiff alleged three claims: (1) an FTCA claim against the United States based on events that allegedly occurred while Plaintiff was incarcerated in the United States Penitentiary in Allenwood, Pennsylvania;[8] (2) a *Bivens* claim against individual Defendant Magyars and Santos based on Plaintiff's claim that they were deliberately indifferent to

---

[7] Plaintiff asserts that the TEC did not consider this.  (*Id.* ¶ 37.)

[8] The FTCA claim alleged in Plaintiff's action in the Middle District of Pennsylvania is entirely distinct from any claim in this action and, therefore, the Court will not discuss the facts of that claim in this Order.

1   Plaintiff's serious medical needs when they denied her gender-affirming surgery; and (3) a

2   claim for "injunctive relief" against the BOP.  (*Id.* at Doc. 11 at 1.)  Plaintiff specifically

3   alleged a claim regarding the BOP's policy regarding gender-affirming surgery and sought

4   an injunction requiring the BOP to provide her with gender-affirming surgery.  (*Id.* at 1-4.)

5         Thereafter, Defendants moved for summary judgment, and the Court granted

6   summary judgment in favor of all Defendants; Judgment was entered on February 26, 2018.

7   (*Id.* at Docs. 55, 57.)  Plaintiff appealed the Judgment to the Third Circuit Court of Appeals,

8   and the Third Circuit reversed and remanded the action to the Middle District of

9   Pennsylvania.  *Pinson v. United States*, No. No. 18-3051, 826 F. App'x 237 (3d Cir. Sept.

10  9, 2020).

11        The Third Circuit Court of Appeals noted that Plaintiff filed an Eighth Amendment

12  *Bivens* claim against the individual Defendants, and also noted that Plaintiff had stated an

13  FTCA claim against the United States and the Federal Bureau of Prisons.  (*Id.* at 240.)

14  Although the Third Circuit noted that Plaintiff sought injunctive relief in the form of

15  gender-affirming surgery, the Third Circuit did not recognize that Plaintiff alleged the

16  claim for injunctive relief as a separate claim against the BOP.  (*Id.*)

17        In discussing Plaintiff's Eighth Amendment claims against the individual

18  Defendants, the Third Circuit stated that Plaintiff alleged that those Defendants denied

19  Plaintiff gender-affirming surgery for non-medical reasons because they allegedly told

20  Plaintiff that she was being denied the gender-affirming surgery "because [she] had

21  requested it in a request for administrative remedy and also stated if [she] continued to file

22  on staff [she] would just be transferred and receive no treatment" and both Defendants

23  allegedly told her that the BOP "would never provide gender-affirming surgery [and] that

24  'for political reasons we will consider it as a policy but never actually follow through'

25  because 'FOX News and Republicans would go crazy.'"  (*Id.* at 242.)  The Third Circuit

26  stated that a reasonable jury could find that the individual Defendants were deliberately

27  indifferent to Plaintiff's serious medical needs if they found that the individual Defendants

28

denied Plaintiff gender-affirming surgery for non-medical reasons.  (*Id.*)  The Third Circuit also reversed the District Court's Judgment as to the FTCA claim.  (*Id.* at 243.)

On December 9, 2020, the Third Circuit issued its Mandate, and thereafter the Court appointed Plaintiff counsel; due to requests for extensions of time made by all Parties, the trial in that action is currently set for April 24, 2023.  (*Pinson v. United States*, No. 1:17-cv-00584-SHR-SM (M.D. Penn.), Docs. 67, 74, 79, 96.)

"The first-to-file rule allows a district court to stay proceedings if a similar case with substantially similar issues and parties was previously filed in another district court."  *Kohn L. Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015).  "The first-to-file rule is intended to serve the purpose of promoting efficiency well and should not be disregarded lightly."  *Id.* (citation omitted).  "When applying the first-to-file rule, courts should be driven to maximize "economy, consistency, and comity, and must consider three factors: chronology of the lawsuits, similarity of the parties, and similarity of the issues."  *Id.* at 1240 (citations omitted).

Here, there is no question that the first two factors are satisfied: Plaintiff filed the action in the Middle District of Pennsylvania first, and the United States and BOP are Defendants to both lawsuits.  *See id.* (the First-to-File rule does not require exact identity of the parties, only substantial similarity.).

With regard to the third factor, the claims needs not be identical but must be substantially similar, and to determine substantial similarity the Court must examine whether there is "substantial overlap" between the two suits.  *Id.* at 1241.  Defendants summarily argue that the First-to-File rule should apply because Plaintiff seeks the same injunctive relief in both lawsuits, but Defendants do not discuss whether there is substantial overlap between the claims (as opposed to the relief sought) in the two suits.  In short, the briefing on this issue is sparse and incomplete.  In the Pennsylvania action, Plaintiff seeks gender-affirming surgery as relief, but Plaintiff cannot obtain such relief from the individual Defendants to the Eighth Amendment *Bivens* claim to that lawsuit.  Although the United States and BOP are Defendants to the FTCA claim in that lawsuit, Plaintiff

would not be able to obtain injunctive relief in the form of gender-affirming surgery with regard to that FTCA claim.

It is unclear whether the Middle District of Pennsylvania is treating Plaintiff's request for injunctive relief as a separate claim against the United States and Federal Bureau of Prisons such that Plaintiff could obtain the relief of gender-affirming surgery. Although Plaintiff alleged that the individual Defendants told her that the BOP had a practice of not providing gender-affirming surgery because "FOX News and Republicans would go crazy," it does not appear that the Middle District of Pennsylvania or the Third Circuit Court of Appeals have treated that as an allegation challenging the BOP's practices such that Plaintiff would be entitled to gender-affirming surgery as injunctive relief in that action.  Without further information about the extent to which the Middle District of Pennsylvania is construing Plaintiff's claims, the Court cannot find on this record that the Middle District of Pennsylvania plans to address allegations relating to the BOP's policies regarding gender-affirming surgery, and Defendants' Motion for Summary Judgment based on the First-to-File rule will be denied.

### B.    Defendant Brieschke

In her First Amended Complaint, Plaintiff alleged that Defendant Brieschke, an attorney for the BOP, was responsible for the denial of Plaintiff's gender-affirming surgery and hormone treatments because "in early 2019, Defendant Brieschke . . . advised . . . Biehler that 42 USC 12211 et seq. prohibited all such treatments."  (Doc. 8 at 3.)

Under the Eighth Amendment standard, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need."  *Jett*, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs.,*

*Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. The state of mind required for deliberate indifference is subjective recklessness; however, the standard is "less stringent in cases involving a prisoner's medical needs . . . because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin*, 974 F.2d at 1060 (quoting *Hudson v. McMillian*, 503 U.S.1, 6 (1992)). Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact, and a fact finder may conclude that a defendant knew of a substantial risk based on the fact that the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). While the obviousness of the risk is not conclusive, a defendant cannot escape liability if the evidence shows that the defendant merely refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true. *Id.*

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted). Deliberate indifference may also be shown by the way in which prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003). And deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or

1  negligence in diagnosing or treating a medical condition does not support an Eighth
2  Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations
3  omitted).  Further, a mere difference in medical opinion does not establish deliberate
4  indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

5         Finally, even if deliberate indifference is shown, to support an Eighth Amendment
6  claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at
7  1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing
8  medical treatment does not constitute Eighth Amendment violation unless delay was
9  harmful).

10        There is no evidence in the record that Brieschke had authority over Plaintiff's
11  medical treatment or that Defendant Haight-Biehler made any medical decisions for
12  Plaintiff based on Defendant Brieschke's advice.  Indeed, the evidence before the Court
13  shows that Brieschke did not have authority over Plaintiff's medical treatments, that
14  Plaintiff was prescribed hormone treatments, and that neither Brieschke or Haight-Biehler
15  made decisions with regard to the appropriateness of gender-affirming surgery.
16  Accordingly, there is no evidence that Brieschke was deliberately indifferent to Plaintiff's
17  serious medical needs and summary judgment will be granted in favor of Defendant
18  Brieschke.

19        **C.     Defendant Haight-Biehler**

20               **1.     Estradiol Pills**

21        In December 2015, Plaintiff was prescribed the Estradiol patch, but after
22  complaining of problems with adhesion, in April 2016, she was prescribed the Estradiol in
23  pill form.  (*Id.* ¶ 7.)  Plaintiff claims that when she was transferred to USP-Tucson on
24  February 15, 2018, she began requesting that she receive Estradiol in patch form.  Plaintiff
25  includes no details, outside of a general time range, about when she requested the patch
26  and what she was told in response to her requests.  Defendants assert that in December
27  2018, Plaintiff requested that her estrogen be changed from a pill to a patch, at which time
28  Plaintiff's Estradiol prescription was changed to a .025mg Estradiol patch.

1    Even assuming Plaintiff began requesting her Estradiol in patch form in February
2    2018, there is nothing in this record showing that Dr. Haight-Biehler refused to change the
3    prescription based on deliberate indifference to Plaintiff's serious medical needs, or that
4    continuing Estradiol in pill form and not patch form posed a serious risk of harm to
5    Plaintiff. Accordingly, summary judgment will be granted in favor of Dr. Haight-Biehler
6    as to Plaintiff's claim that she was given Estradiol in pill form instead of patch form for 10
7    months.

8                              **2.       Gender-affirming surgery**

9            There is no evidence in the record before the Court that Dr. Haight-Biehler denied
10   Plaintiff gender-affirming surgery or had authority to deny Plaintiff gender-affirming
11   surgery. Rather, the record shows that the Warden twice forwarded Plaintiff's request for
12   gender-affirming surgery to the TEC for consideration and the TEC denied the request
13   while advising about possible treatments, such as increasing Plaintiff's Spironolactone
14   dosage, and that Dr. Haight-Biehler acted on those recommendations. The evidence shows
15   that Dr. Haight-Biehler was not a member of the TEC and had no authority over the TEC's
16   decisions. Accordingly, there is no evidence that Dr. Haight-Biehler denied Plaintiff
17   gender-affirming surgery or was otherwise involved with decisions regarding whether
18   Plaintiff would be considered for gender-affirming surgery, and therefore, no evidence that
19   Dr. Haight-Biehler was deliberately indifferent to Plaintiff's serious medical needs based
20   on the denial of gender-affirming surgery, and summary judgment will be granted in favor
21   of Dr. Haight-Biehler.

22           **D.     Policy Claims—Eighth Amendment and Fifth Amendment**

23           "Although the Fifth Amendment does not have an equal protection clause, it does
24   contain a due process clause which prohibits the federal government from engaging in
25   discrimination that is 'so unjustifiable as to be violative of due process," and "provides the
26   same protection and requires the same analysis as Fourteenth Amendment equal
27   protection." *Rodriguez v. Cook*, 169 F.3d 1176, 1178-79 (9th Cir. 1999); *see Weinberger
28   v. Wiesenfeld*, 420 U.S. 636, 638 n.2(1975) (the approach to Fifth Amendment due process

1    claims is "precisely the same as to equal protection claims under the Fourteenth
2    Amendment.") (citations omitted).

3        A Fourteenth Amendment equal protection claim may be established by showing
4    that prison officials intentionally discriminated against a plaintiff based on her membership
5    in a protected class. *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d
6    690, 70203 (9th Cir. 2009); *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003), *Lee*
7    *v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001). The Court must apply heightened
8    scrutiny to Plaintiff's claim that the BOP's policies discriminate against her based on her
9    transgender status. *See Hecox v. Little*, 479 F. Supp. 3d 930, 972–75 (D. Idaho 2020)
10   (citing cases). "The purpose of this heightened level of scrutiny is to ensure quasi-suspect
11   classifications do not perpetuate unfounded stereotypes or second-class treatment, and
12   therefore, "[t]o withstand heightened scrutiny, classification by sex must serve important
13   governmental objectives and must be substantially related to achievement of those
14   objectives." *Id.* (internal citations omitted).

15       Here, the BOP argues that the requirements set forth before a prisoner may qualify
16   for gender-affirming surgery are in place for the institution's safety and security, and are
17   based on individualized determinations with regard to whether a particular prisoner has
18   met the medical and mental health requirements prior to obtaining gender-affirming
19   surgery. Defendants assert that Plaintiff has not met the requirements under the policy
20   because she is classified maximum custody and has not successfully completed hormone
21   therapy, both of which prevent her from transfer to a female prison, where she could gain
22   real world experience as a member of her proposed gender; that Plaintiff has not obtained
23   the appropriate letters from medical providers indicating that she is in need of gender-
24   affirming surgery; and that Plaintiff has not successfully completed hormone therapy. The
25   BOP produces evidence that there are currently six transgender prisoners living in
26   institutions consistent with their identified gender, which, under the policy, is one of the
27   steps necessary to obtaining a recommendation for gender-affirming surgery.

28

1    In Response, Plaintiff argues that this is not the BOP's policy, but produces no

2    evidence to contradict Defendants' evidence that these are their policies.  Plaintiff also does

3    not present a facial challenge to the policy by arguing that the requirements themselves

4    violate either Plaintiff's rights to equal protection or to be free from cruel and unusual

5    punishment.   Rather, Plaintiff presents new claims not alleged in her First Amended

6    Complaint, that she is being prevented from meeting the requirements of the policy because

7    (1) Defendants falsely categorize her as a maximum security inmate and/or she is forced

8    to take actions that ensure she will be kept in maximum security for her own protection

9    because prison officials refuse to otherwise protect her,[9] (2) she was never given the Lupron

10   ordered by Dr. Haight-Biehler to help with her hormone levels, her hormone levels were

11   not regularly tested while she was in the custody of USP-Tucson, and she has never been

12   given a "treatment plan," and (3) the TEC has never actually considered whether she is a

13   candidate for gender-affirming surgery.

14        While the Court is sympathetic to Plaintiff's pro se status and her allegations and

15   arguments are serious, the Court only has jurisdiction over the claims that Plaintiff brought

16   in her First Amended Complaint.  In her First Amended Complaint, Plaintiff specifically

17   alleged that the BOP would not consider her for gender-affirming surgery on an individual

18   basis and there was no policy in place for Plaintiff to be considered on an individual basis.

19   Now, Plaintiff appears to concede that there is a policy, that she does not meet the

20   requirements for gender-affirming surgery pursuant to the policy, but that she is prevented

21   from meeting the policy requirements for various reasons.  This is an entirely new claim

22   that was never alleged in Plaintiff's First Amended Complaint.  For purposes of fairness in

23   the discovery process and the Prison Litigation Reform Act's requirements relating to

24

25

26        [9] Although Plaintiff put the BOP on notice that she wanted gender-affirming surgery
     and exhausted her administrative remedies as to that claim, there is no evidence that
27   Plaintiff has ever notified BOP or exhausted a claim that she is wrongfully classified in
     maximum custody as a pretext for denying her gender-affirming surgery or that she has
28   had to ensure that she maintain her maximum custody status because the BOP refuses to
     protect her.

exhaustion, the Court must not decide claims that are not before it.  Plaintiff's claims that prison officials refuse to protect her, forcing her to take actions that result in a maximum security designation and Plaintiff's allegations that prison officials have told her that she will never be removed from maximum security were not alleged in her First Amended Complaint, and are therefore not properly before the Court in this action.  Likewise, Plaintiff's allegations regarding Lupron[10] and not being regularly tested for hormones are not before the Court in this action.

The evidence before the Court shows that Plaintiff was on hormone therapy, that her doctor reviewed her hormone therapy and changed it as she believed was medically necessary in order to get Plaintiff's hormones to appropriate levels, that the TEC made some recommendations for changes in Plaintiff's hormones, and that Dr. Haight-Biehler considered those changes and made the changes, and the record reflects that before Plaintiff's transfer out of USP-Tucson, Dr. Haight-Biehler was still attempting to make changes to Plaintiff's medications in order to assist Plaintiff in succeeding with hormone therapy.

Accordingly, although Plaintiff argues that there was no "plan" in place for her medical treatment relating to gender dysphoria, the record evidence shows that Plaintiff's providers were providing her medical treatment relating to her gender dysphoria and that whether or not there was a memorialized "plan," her providers were working to provide Plaintiff hormone therapy.  Moreover, the record reflects that Plaintiff's allegation that the

---

[10] There is no evidence before the Court as why the Lupron requested by Dr. Haight-Biehler was not distributed to Plaintiff, whether this was the result of negligence, or who was responsible for the failure to provide Plaintiff Lupron while Plaintiff was housed at USP-Tucson.  It is unclear whether Plaintiff has exhausted any claims relating to the provision of Lupron, and Defendants were not given notice in this action about this portion of Plaintiff's claim.  Moreover, because there is no evidence in this record that Dr. Haight-Biehler—who twice sought approval to get Plaintiff Lupron—was deliberately indifferent to Plaintiff's serious medical needs, and Plaintiff is no longer in Dr. Haight-Biehler's care, Plaintiff would not be entitled to damages against Dr. Haight-Biehler or any injunctive relief related to this claim in this action.  There is no allegation or evidence that the failure to provide Plaintiff Lupron was the result of a policy of the BOP.

1  TEC never considered her to be a candidate for gender-affirming surgery is correct insofar
2  as the TEC required Plaintiff to meet the necessary requirements under the policy before
3  they would consider her to be a candidate for gender-affirming surgery.  There is no
4  evidence in the record that Plaintiff met the requirements necessary under the policy to be
5  considered a candidate for gender-affirming surgery.

6          The BOP offers multiple reasons why, prior to a recommendation for gender-
7  affirming surgery, it requires hormone levels to meet certain requirements and requires
8  placement in a female institution, and that before placement in a female institution, a
9  Plaintiff must meet certain custody classification requirements and must successfully
10  complete hormone therapy.  The BOP also asserts that it requires the recommendation of
11  medical providers before considering a prisoner for gender-affirming surgery.[11]  There is
12  no evidence in this record showing that these requirements are not for important
13  government objectives or are not substantially related to the achievement of those
14  objectives.  Likewise, Plaintiff has produced no evidence, on this record, that these policies
15  are deliberately indifferent to her serious medical needs.  Accordingly, on the record
16  currently before the Court, there is no evidence that the BOP's policies, as applied to
17  Plaintiff, violate the Fifth or Eighth Amendments, and as discussed above, Plaintiff does
18  not facially challenge the policies or present evidence demonstrating that the policies are
19  facially unconstitutional.  Accordingly, the Court will dismiss without prejudice Plaintiff's
20  claims for permanent injunctive relief against the Defendant United States and Federal
21  Bureau of Prisons based on alleged violations of her Fifth and Eighth Amendment rights
22  with regard to the denial of gender-affirming surgery.

23  . . . .

24  . . . .

25  _____

26          [11] Defendants do not explain how a prisoner would obtain two recommendations
27  from medical providers while housed in prison, but because Plaintiff has not shown she
   has met the other requirements under the policy and has not produced evidence showing
28  that the other requirements violate her constitutional rights, the Court need not address that
   assertion at this time.

1    **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 102) is
2    **granted**.  Plaintiff's claims for injunctive relief relating to the denial of gender-affirming
3    surgery are **dismissed without prejudice**.  Plaintiff's Eighth Amendment claims against
4    Defendants Haight-Biehler and Brieschke are **dismissed with prejudice**.  This action is
5    terminated with prejudice.  The Clerk of Court must enter judgment accordingly.
6    Dated this 13th day of April, 2022.

Honorable Rosemary Márquez
United States District Judge